## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |  |
|---|---|---|
| BROWSERKEY, LLC, | § | Case No. |
|  | § |  |
| Plaintiff, | § | **JURY TRIAL DEMANDED** |
|  | § |  |
| v. | § |  |
|  | § |  |
| MORGAN STANLEY & CO. LLC, | § |  |
|  | § |  |
| Defendant. | § |  |
|  | § |  |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff BrowserKey, LLC ("BrowserKey" or "Plaintiff") for its Complaint against Morgan Stanley & Co. LLC ("Morgan Stanley" or "Defendant") alleges as follows:

## THE PARTIES

1.      BrowserKey is incorporated under the laws of the State of Texas, with a place of business located at 101 East Park Boulevard, Suite 600, Plano, Texas 75074.

2.      Upon information and belief, Defendant Morgan Stanley is a corporation organized and existing under the laws of the State of Delaware, with regular and established places of business in this District at least at 7500 Dallas Parkway, # 500, Plano, Texas 75024. Upon information and belief, Defendant may be served with process via its registered agent, C T Corporation system, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## JURISDICTION AND VENUE

3.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1338, and 1367.

4.     This Court has specific and personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. Upon information and belief, Defendant has sufficient minimum contacts with the forum because Defendant has physical locations and transacts substantial business in the State of Texas and in this Judicial District. Further, Defendant has, directly or through subsidiaries or intermediaries, committed acts of patent infringement in the State of Texas and in this Judicial District as alleged in this Complaint, as alleged more particularly below.

5.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391 and 1400(b). Defendant is registered to do business in Texas and, upon information and belief, Defendant has transacted business in this Judicial District, has committed acts of direct and indirect infringement in this Judicial District, and has regular and established places of business in this Judicial District as set forth above. Defendant is subject to personal jurisdiction in this Judicial District and has committed acts of patent infringement in this Judicial District. On information and belief, Defendant through its own acts and/or through the acts of others, makes, uses, sells, offers to sell, and/or imports infringing products within this Judicial District, regularly does and solicits business in this Judicial District, and has the requisite minimum contacts with the Judicial District, such that this venue is a fair and reasonable one. Further, upon information and belief, Defendant has admitted or not contested proper venue in this Judicial District in other patent infringement actions.

## U.S. PATENT NO. 7,249,262

6.     On July 24, 2007, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,249,262 (the "'262 Patent," or "Patent-in-Suit") entitled "Method For Restricting Access To A Web Site By Remote Users." A true and correct copy of the '262 Patent is attached hereto as Exhibit A.

7.    BrowserKey is the sole and exclusive owner of all right, title, and interest to and in the '262 Patent, and holds the exclusive right to take all actions necessary to enforce its rights to the '262 Patent, including the filing of this patent infringement lawsuit. BrowserKey also has the right to recover all damages for infringement of the '262 Patent as appropriate under the law.

## INFRINGEMENT ALLEGATIONS

8.    The '262 Patent generally covers a method of restricting access to data maintained on a server computer by one or more authorized, networked client machines. The technology was developed by Leon E. Hauck and Brent J. Burval. This technique is incorporated into web and mobile applications made by numerous banking institutions, including Morgan Stanley.

9.    Morgan Stanley has manufactured, used, marketed, distributed, sold, offered for sale, exported from, and imported into the United States, products that infringe the '262 Patent. These Accused Products include at least all versions and variants of the Morgan Stanley Mobile Applications since 2019. The Accused Products include at least all versions and variants of the Morgan Stanley Mobile Applications which have supported any biometric, token-based, and/or passwordless authentication. For example, the Accused Products comprise at least the Morgan Stanley Wealth Management, Shareworks, Morgan Stanley Matrix Mobile, Global Stock & Reward Services, and Morgan Stanley Stock Plan applications for iOS, iPadOS, and Android, including all supporting servers, computer systems, and infrastructures, since at least 2019.

10.    BrowserKey has at all times complied with the marking provisions of 35 U.S.C. § 287 with respect to the '262 Patent.

11.    Upon information and belief, Morgan Stanley has had knowledge and notice of the Patent-in-Suit, and its infringement thereof, since it issued. Morgan Stanley, as a bank, regularly monitors ways to secure its mobile and web applications, and upon information and belief,

monitored or was otherwise aware of Plaintiff's patented inventions, including due to their impact on Morgan Stanley and Morgan Stanley's competitor's security systems. Alternatively, to the extent that Morgan Stanley avoided actual knowledge of the Patent-in-Suit, and its infringement thereof, it was willfully blind. Upon information and belief, to the extent it lacked actual knowledge of infringement, Morgan Stanley deliberately avoided learning of infringement, despite subjectively believing that there was a high probability that it infringed the Patent-in-Suit. Upon information and belief, Morgan Stanley has adopted a policy or practice of not reviewing the patents of others, including those related to Morgan Stanley's specific industry and of Plaintiff in particular, thereby remaining willfully blind to the Patent-in-Suit. Upon information and belief, Morgan Stanley lacks written policies disseminated to employees regarding monitoring or avoidance of patent infringement by Morgan Stanley and lacks mechanisms for employees to report patents which they believe Morgan Stanley may infringe. Upon information and belief, Morgan Stanley and its employees understood that there was a high likelihood that patents filed on innovations by Plaintiff read on the Accused Products.

## <u>COUNT I</u>
### (Infringement of the '262 Patent)

12.    Paragraphs 1 through 11 are incorporated by reference as if fully set forth herein.

13.    BrowserKey has not licensed or otherwise authorized Morgan Stanley to make, use, offer for sale, sell, or import any products that embody the inventions of the '262 Patent.

14.    Morgan Stanley has and continues to directly infringe the '262 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '262 Patent. These products include at least all versions and variants of the Morgan Stanley Web and Mobile Applications.

15.     For example, Morgan Stanley directly infringes at least claim 1 of the '262 Patent by practicing a method of restricting access to data maintained on a server computer by an authorized client machine, said method comprising the steps of: a. installing a client-side software program on the client machine for generating a client machine-specific identifier, the client machine-specific identifier being substantially unique to the particular machine upon which such client-side software program is initially installed; b. operating the client-side software program on the client machine to generate the client machine-specific identifier; c. generating a password remote from the client machine and providing the password to a user of the client machine, the password being derived from the client machine-specific identifier generated in step b., and uniquely corresponding thereto; d. issuing a request by the client machine to the server computer for access to data maintained on the server computer; e. responding to the request for access of step d. by having the client machine re-generate its machine-specific identifier; f. verifying on the client machine whether the client machine-specific identifier re-generated in step e. uniquely corresponds with the password generated in step c.; and g. recognizing the client machine as being authorized to access data maintained on the server computer if the verification performed by step f. is true, and refusing to recognize the client machine as being authorized to access data maintained on the server computer if the verification performed by step f. is false.

16.     The Accused Products practice a method of restricting access to data maintained on a server computer by an authorized client machine. For example, upon information and belief, on client machines running Morgan Stanley Wealth Management variant for Apple iOS, one method by which an operator may sign in to access Morgan Stanely's "protected URLs," as a Morgan Stanely account holder, is via Apple's Touch and Face ID (locally compared "biometrics"). This

biometric process authorizes the client machine to access restricted data on Morgan Stanley server(s).



https://play.google.com/store/apps/details?id=com.morganstanley.clientmobile.prod&hl=en_US

17.    The Accused Products practice a method of installing a client-side software program on the client machine for generating a client machine-specific identifier, the client machine-specific identifier being substantially unique to the particular machine upon which such client-side software program is initially installed. For example, a client-side software program (e.g., the Morgan Stanley Wealth Management) is installed on the client machine (e.g., a phone running Morgan Stanley Wealth Management), and generates a client machine specific identifier (e.g., a device key, certificate, public/private key pair, and/or other cryptographic material). Upon information and belief, each such identifier is unique to the client machine upon which such client-

side software program is initially installed (e.g., to an instance of Morgan Stanley Wealth Management running on a specific client machine).

18.     The Accused Products practice a method of operating the client-side software program on the client machine to generate the client machine-specific identifier. For example, upon launch of the Morgan Stanley Application, the Morgan Stanley servers verify that a client application adapted to calculate a machine specific identifier with a machine specific key (e.g., a Morgan Stanley Wealth Management Application configured to calculate a signature, device key, certificate, public/private key pair, and/or other cryptographic material based on cryptographic and/or seed material of a machine-specific identifier provided to the client by the server within a policy or registration request) exists on the client device (e.g., is installed), or provides that client application to the device (e.g., by triggering an update or transmission to the Morgan Stanley Wealth Management Application).

19.     The Accused Products practice a method of generating a password remote from the client machine and providing the password to a user of the client machine, the password being derived from the client machine-specific identifier generated in step b, and uniquely corresponding thereto. For example, upon information and belief, the Morgan Stanley servers generate a password (e.g., a nonce, token, cryptographic key, certificate, cryptogram, signed nonce, and/or other cryptographic material) derived from a client machine-specific identifier generated on the client machine (e.g., by applying a signature or transform based on a seed value to the a private key and/or device keys associated with, and/or generated based on material from, the secure element of the device). The Morgan Stanley servers then provide that password to the client machine (e.g., by transmitting the password to a smartphone running the Morgan Stanley Wealth Management Application via HTTP protocol). For example, upon information and belief, that

password, is either stored inside, or wrapped in encryption provided by, a secure element/secure enclave/secure execution environment of the mobile device running the Morgan Stanley Application. Upon information and belief, the seed value, signature, and/or algorithm are also stored inside or wrapped in encryption provided by that secure element/secure enclave/secure execution environment.

20.     The Accused Products practice a method of issuing a request by the client machine to the server computer for access to data maintained on the server computer. For example, Morgan Stanley servers receive a request (e.g., an HTTP request) from a client machine (e.g., a smartphone running the Morgan Stanley Wealth Management Application) for access to data stored on a server (e.g., account information stored on a server) when the application is launched. For example, when first launching the Morgan Stanley Wealth Management Application, upon information and belief, a user agent requests a protected URL associated with Morgan Stanley.

21.     The Accused Products practice a method of responding to the request for access of step d. by having the client machine re-generate its machine-specific identifier; and verifying on the client machine whether the client machine-specific identifier re-generated in step e. uniquely corresponds with the password generated in step c. For example, upon information and belief, when biometric authentication is enabled on the Morgan Stanley Wealth Management App, the Morgan Stanley servers transmit instructions to re-generate the password (e.g., the seed value and algorithm that can be applied to the nonce, token, device key, public key, and/or key pair to generate a matching password and/or signed nonce), and to verify, on the client machine, whether the client machine-specific identifier uniquely corresponds with the password generated at step b (e.g., by utilizing fingerprint, face, or iris recognition to authenticate a user, thereby granting access to the secure element-protected password, and applying same the seed value and algorithm to the

public key, nonce, signature, and/or key pair to verify that it matches the one transmitted by the server). For example, upon information and belief, when the client machine supports Apple Touch / Face ID, and the Morgan Stanley Wealth Management App has been provisioned to sign in to Morgan Stanley online services via Touch / Face ID, Morgan Stanley computer code automatically prompts the operator to sign in via Touch / Face ID immediately after the app is launched.

22.     The Accused Products practice a method of recognizing the client machine as being authorized to access data maintained on the server computer if the verification performed by step f. is true, and refusing to recognize the client machine as being authorized to access data maintained on the server computer if the verification performed by step f. is false. For example, if the sign in on the client machine is successful, access to data maintained on Morgan Stanley servers(s) is authorized by Morgan Stanley. If the client machine is not signed in, access to data maintained on Morgan Stanley servers(s) is denied by Morgan Stanley.

23.     For example, Morgan Stanley directly infringes at least claim 11 of the '262 Patent by making, using, offering to sell, selling, and/or importing into the United States products that practice a method of restricting access to data maintained on a server computer by an authorized client machine, said method comprising the steps of: a. creating a session identifier in a computer remote from the client machine for a current browsing session of the client machine; b. transmitting to the client machine the session identifier created in step a.; c. storing the session identifier transmitted in step b. within the client machine; d. verifying, on the client machine, that the client machine is authorized to access data maintained on the server computer; e. obtaining the session identifier stored in step c., and storing such session identifier within a storage table remote from the client machine if such client machine was verified in step d.; f. transmitting a request by the client machine for access to data maintained on the server computer, such request including the

session identifier stored in step c.; g. comparing the session identifier transmitted in step f. with the session identifier stored in the storage table during step e. to determine whether the request for access transmitted in step f. is authorized; and h. permitting access by the client machine to the requested data maintained on the server computer if the comparison made in step g. shows that the request for access is authorized, and denying access by the client machine to the requested data maintained on the server computer if the comparison made in step g. shows that the request for access is not authorized.

24.    The Accused Products practice a method of restricting access to data maintained on a server computer by an authorized client machine. For example, upon information and belief, on client machines running the Morgan Stanley Wealth Management Application variant for Apple iOS, one method by which an operator may sign in to access Morgan Stanley's "protected URLs," as a Morgan Stanley Account holder, is via Apple's Touch and Face ID (locally compared "biometrics").

25.    The Accused Products further practice a method creating a session identifier in a computer remote from the client machine for a current browsing session of the client machine. For example, upon information and belief, Morgan Stanley server computer(s) create one or more session identifiers, remote from the client machine, when a new user agent session on the client machine initially requests, via the HTTP protocol, a Morgan Stanley "protected URL." For example, upon information and belief, a Morgan Stanley server creates a session identifier (e.g., a static or dynamic session ID, token, and/or certificate) upon successful access by a client-device running the Morgan Stanley Wealth Management Application. Further, upon information and belief, when first launching the Morgan Stanley URLs. In response to the request, one or more name-value pair(s) are created by the Morgan Stanley server(s).

26.    The Accused Products further practice a method of transmitting to the client machine the session identifier created in step a. Upon information and belief, Morgan Stanley transmits the session identifier(s) to the client machine via the Internet. Session identifier(s) are transmitted by the Morgan Stanley HTTP server computer(s) to the client machine via one or more HTTP response headers and/or HTTP response bodies. For example, upon information and belief, a Morgan Stanley server transmits the session identifier (e.g., a static or dynamic session ID, token, and/or certificate) to a client machine (e.g., a phone running the Morgan Stanley Wealth Management App) upon initiating of the log-in process. Upon information and belief, this session identifier is stored in secure memory associated with the Morgan Stanley Wealth Management App, and used to identify the session by a client-device (e.g., phone running the Morgan Stanley Wealth Management App) in subsequent communications and request/response processes with the Morgan Stanley server for the duration of a browsing session. Upon information and belief, each such communication includes at least one name-value pair, comprising of at least one session identifier.

27.    The Accused Products further practice a method of storing the session identifier transmitted in step b. within the client machine. Upon information and belief, per instructions from Morgan Stanley servers and/or Morgan Stanley computer code, the web browser stores the session identifiers(s) on the client machine. Upon information and belief, such instructions are transmitted in the form of code, automatically executed by the Morgan Stanley App, and/or by a browser operated based on computer instructions by the Morgan Stanley App. For example, upon information and belief, the Morgan Stanley Wealth Management App further stores the identifier in a client device (e.g., a phone), in secure memory associated with the application.

28.    The Accused Products further practice a method of verifying, on the client machine, that the client machine is authorized to access data maintained on the server computer. Upon information and belief, when the client machine supports Apple Touch / Face ID, and the Morgan Stanley Wealth Management Application has been provisioned to sign in to Morgan Stanley online services via Touch / Face ID, Morgan Stanley computer code automatically prompts the operator to sign in via Touch / Face ID immediately after the application is launched. For example, upon information and belief, the Morgan Stanley Wealth Management Application verifies that a user is authorized to access data maintained on a Morgan Stanley server by locally authenticating and/or validating that its Session ID shows a user is logged in. For example, the Morgan Stanley Wealth Management App locally verifies that it is authorized to access data maintained on the Morgan Stanley servers by authenticating an operator's biometric information.



https://play.google.com/store/apps/details?id=com.morganstanley.clientmobile.prod&hl=en_US

29.     The Accused Products further practice a method of obtaining the session identifier stored in step c., and storing such session identifier within a storage table remote from the client machine if such client machine was verified in step d. Upon information and belief, the Morgan Stanley Web Application is an extension or related to a remote Morgan Stanley storage table storing session identifier(s). For example, upon information and belief, once an operator has logged into the Morgan Stanley Wealth Management App using biometric authentication, the Morgan Stanley server system obtains the session identifier from the Morgan Stanley Wealth Management App client, e.g., through a request/response in which the client confirms local verification of biometric information. Upon information and belief, the Morgan Stanley Server then stores the session identifier in a table within secure memory associated with the server, where it is used to address transmission of data to the client.

30.     The Accused Products further practice a method of transmitting a request by the client machine for access to data maintained on the server computer, such request including the session identifier stored in step c. Upon information and belief, per instructions from Morgan Stanley servers and/or Morgan Stanley computer code, upon successful sign in, the user agent is automatically redirected to the default Morgan Stanley Wealth Management Application page (a Morgan Stanley "Protected URL") which invokes one or more HTTP requests. The HTTP request(s) are transmitted by the client machine and such request(s) include session identifier(s) to overcome limitations of the stateless HTTP protocol. For example, upon information and belief, the Morgan Stanley Wealth Management App running on a client machine (e.g., a phone) transmits requests for access to data maintained on the server computer (e.g., to Morgan Stanley brokerage and/or bank account data maintained on the Morgan Stanley server system). Upon information and

belief, all request/response communications once the log-in process is initiated, including for such account data, include the session identifier.

31.    The Accused Products further practice a method of comparing the session identifier transmitted in step f. with the session identifier stored in the storage table during step e. to determine whether the request for access transmitted in step f. is authorized. Upon information and belief, Morgan Stanley compares session identifier(s) remotely. For example, when session cookies (which store session identifiers(s)) are deleted from the client machine, the client machine is no longer logged in and no longer able to access Morgan Stanley "Protected URLs." Upon information and belief, the Morgan Stanley servers further compare the session identifier transmitted by a Morgan Stanley Wealth Management App with the corresponding identifier stored in a storage table to determine whether the request for access (e.g., to a brokerage and/or bank account) is authorized (e.g., whether the user logged in based on biometric information presented to the Morgan Stanley Wealth Management App).

| Categories of Entities to Whom We May Disclose Personal Information | Categories of Personal Information We May Disclose |
|---|---|
| **Operational Entities**<br><br>We may disclose your personal information to entities that help us perform the Services, including, for example, companies that provide administrative, telecommunications, system, software, trade execution, payment, and securities clearing services, and that prepare and send account statements and transaction confirmations and other services in connection with the operation of our business. | • Identifiers<br><br>• Financial information<br><br>• Commercial information<br><br>• Protected Class Information<br><br>• Biometric information<br><br>• Sensory data<br><br>• Professional or employment-related information |

**8.    Use of Cookies and Similar Technologies**

We, our affiliates and/or other persons acting on our or their behalf use cookies and similar technology, such as web beacons (also known as clear GIFs or pixel tags), and may use related technologies as they develop over time.  We use these technologies to collect, use, and/or disclose information for a variety of purposes - including, in certain cases, cross-context behavioral advertising when you visit our online services or interact with us online, e.g., via email or other electronic means.  Where applicable, we enable individuals to opt out of cross-context behavioral advertising by recognizing opt-out preference signals, also known as Global Privacy Controls (GPCs). To view our and our affiliates' Global Cookie Policy, click here.

https://www.morganstanley.com/disclaimers/us-privacy-policy-and-notice

32.    The Accused Products further practice a method of permitting access by the client machine to the requested data maintained on the server computer if the comparison made in step g. shows that the request for access is authorized, and denying access by the client machine to the requested data maintained on the server computer if the comparison made in step g. shows that the

request for access is not authorized. Upon information and belief, if the client machine is signed in, access to data maintained on Morgan Stanley servers(s) is authorized by Morgan Stanley. If the client machine is not signed in, access to data maintained on Morgan Stanley servers(s) is denied by Morgan Stanley. For example, upon information and belief, the Morgan Stanley servers permit access by a client machine to the requested data maintained on the server computer (e.g., access to a brokerage and/or bank account by the Morgan Stanley Wealth Management App) if the comparison made in step g. shows that the request for access is authorized (e.g., that the user has logged in based on authentication of biometric information), or deny access (e.g., fail to return access to requested brokerage and/or bank account information) if the comparison shows that the request is not authorized (e.g., a user's log-in was not successful).

33.     For example, Morgan Stanley directly infringes at least claim 14 of the '262 Patent by making, using, offering to sell, selling, and/or importing into the United States products that comprise a computer program product tangibly embodied in an information carrier, the computer program product including instructions that, when executed, perform operations for restricting access to data maintained on a server computer, the method comprising: a. receiving a request from a client machine for access to data stored on a server; b. generating a password remote from the client machine, and providing the password to the client machine or to a user of the client machine, the password being derived from, and corresponding to, a client machine-specific identifier generated on the client machine; c. transmitting to the client machine instructions to re-generate the password and to verify, on the client machine, whether the client machine-specific identifier uniquely corresponds with the password generated at step b.; and d. allowing access to the data if the verification performed by step c. is true, and denying access to the data if the verification performed by step c. is false.

34.     Each Accused Product comprises a computer program product tangibly embodied in an information carrier, the computer program product including instructions that, when executed, perform operations for restricting access to data maintained on a server computer, the method comprising the functionality of claim 14. For example, Morgan Stanley's servers supporting the Morgan Stanley Wealth Management Application include a computer program product tangibly embodied in an information carrier (e.g., a software program running in memory) including instructions which, when executed, perform operations for restricting access to a user's account information via the Morgan Stanley Wealth Management Application as recited below, e.g., by allowing access via biometric authentication.

35.     Each Accused Product comprises a computer program product tangibly embodied in an information carrier, the computer program product including instructions that, when executed, performs receiving a request from a client machine for access to data stored on a server. For example, Morgan Stanley servers receive a request (e.g., an HTTP request) from a client machine (e.g., a smartphone running the Morgan Stanley Wealth Management App) for access to data stored on a server (e.g., account information stored on a server) when the application is launched. For example, when first launching the Morgan Stanley Wealth Management App, upon information and belief, a user agent requests a protected URL associated with Morgan Stanley. Such requests are received by Morgan Stanley servers responsible for restricting access to account data, as demonstrated by the below response demonstrating requests by a client machine to data stored on at least six secure servers during the log-in process. Upon information and belief, each such communication includes at least a name-value pair.

36.     Each Accused Product comprises a computer program product tangibly embodied in an information carrier, the computer program product including instructions that, when

executed, performs generating a password remote from the client machine, and providing the password to the client machine or to a user of the client machine, the password being derived from, and corresponding to, a client machine-specific identifier generated on the client machine. For example, the Morgan Stanley servers generate a password (e.g., a nonce, cryptographic key, public key, certificate, cryptogram, token, and/or other cryptographic material) derived from a client machine-specific identifier generated on the client machine (e.g., by applying a transform based on a seed value to a private key and/or device keys associated with or protected by the secure element of the device). The Morgan Stanley servers then provide that password (to the client machine (e.g., by transmitting the password to a smartphone running the Morgan Stanley Wealth Management App via HTTP protocol). Upon information and belief, that password, is either stored inside, or wrapped in encryption provided by, a secure element/secure enclave of the mobile device running the Morgan Stanley Wealth Management App. The seed value and algorithm are also stored inside or wrapped in encryption provided by that secure element/secure enclave.

37.     Each Accused Product comprises a computer program product tangibly embodied in an information carrier, the computer program product including instructions that, when executed, performs transmitting to the client machine instructions to re-generate the password and to verify, on the client machine, whether the client machine-specific identifier uniquely corresponds with the password generated at step b. For example, upon information and belief, when biometric authentication is enabled on the Morgan Stanley Wealth Management App, the Morgan Stanley servers transmit instructions to re-generate the password (e.g., the seed value and algorithm that can be applied to the nonce, token, device key, public key, and/or key pair to generate a matching password and/or signed nonce), and to verify, on the client machine, whether the client machine-specific identifier uniquely corresponds with the password generated at step b.

(e.g., by utilizing fingerprint, face, or iris recognition to authenticate a user, thereby granting access to the secure element-protected password, and applying same the seed value and algorithm to the public key, nonce, signature, and/or key pair to verify that it matches the one transmitted by the server).

38.    Each Accused Product comprises a computer program product tangibly embodied in an information carrier, the computer program product including instructions that, when executed, performs allowing access to the data if the verification performed by step c. is true, and denying access to the data if the verification performed by step c. is false. For example, if the sign in on the client machine is successful, access to data maintained on Morgan Stanley servers(s) is authorized by Morgan Stanley. If the client machine is not signed in, access to data maintained on Morgan Stanley servers(s) is denied by Morgan Stanley.

39.    Morgan Stanley indirectly infringes one or more claims of the '262 Patent by knowingly and intentionally inducing others, including Morgan Stanley customers and end-users of the Accused Products and products that include the Accused Products, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology, such as the Morgan Stanley Web and Mobile Applications.

40.    Morgan Stanley indirectly infringes one or more claims of the '262 Patent, as provided by 35 U.S.C. § 271(b), by inducing infringement by others, such as Morgan Stanley's customers and end-users, in this District and elsewhere in the United States. For example, Morgan Stanley's customers and end-users directly infringe, either literally or under the doctrine of equivalents, through their use of the inventions claimed in the '262 Patent. Morgan Stanley induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or

otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. Because of Morgan Stanley's inducement, Morgan Stanley's customers and end-users use Accused Products in a way Morgan Stanley intends and directly infringe the '262 Patent. Morgan Stanley performs these affirmative acts with knowledge of the '262 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '262 Patent.

41.    Morgan Stanley indirectly infringes one or more claims of the '262 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Morgan Stanley's affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold and offered for sale contributes to others' use and manufacture of the Accused Products, such that the '262 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '262 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Morgan Stanley to be especially made or adapted for use in the infringement of the '262 Patent. Morgan Stanley performs these affirmative acts with knowledge of the '262 Patent and with intent, or willful blindness, that they cause the direct infringement of the '262 Patent.

42.    Morgan Stanley's infringement of the '262 Patent is willful, at least because it has knowingly and deliberately infringed the '262 Patent.

43.    BrowserKey has suffered damages as a result of Morgan Stanley's direct and indirect infringement of the '262 Patent in an amount to be proved at trial.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, BrowserKey prays for relief against Morgan Stanley as follows:

a.     Entry of judgment declaring that Morgan Stanley has directly and/or indirectly infringed one or more claims of the '262 Patent;

b.     Entry of judgment declaring that Morgan Stanley's infringement of the '262 Patent is willful;

c.     An order awarding damages sufficient to compensate BrowserKey for Morgan Stanley's infringement of the '262 Patent, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest and costs;

d.     Entry of judgment declaring that this case is exceptional and awarding BrowserKey its costs and reasonable attorneys' fees under 35 U.S.C. § 285;

e.     An accounting for acts of infringement;

f.     Such other equitable relief which may be requested and to which the Plaintiff is entitled; and

g.     Such other and further relief as the Court deems just and proper.


Dated: April 28, 2025                                 Respectfully submitted,

                                                      _/s/ Vincent J. Rubino, III_____
                                                      Alfred R. Fabricant
                                                      NY Bar No. 2219392
                                                      Email: ffabricant@fabricantllp.com
                                                      Peter Lambrianakos
                                                      NY Bar No. 2894392
                                                      Email: plambrianakos@fabricantllp.com
                                                      Vincent J. Rubino, III

NY Bar No. 4557435
Email: vrubino@fabricantllp.com
Jacob Ostling
NY Bar No. 5684824
Email: jostling@fabricantllp.com
**FABRICANT LLP**
411 Theodore Fremd Avenue,
Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797
Facsimile: (212) 257-5796

Justin Kurt Truelove
State Bar No. 24013653
Email: kurt@truelovelawfirm.com
**TRUELOVE LAW FIRM, PLLC**
100 West Houston Street
Marshall, Texas 75670
Telephone: (903) 938-8321
Facsimile: (903) 215-8510 Fax

**ATTORNEYS FOR PLAINTIFF
BROWSERKEY LLC**